## WM. SCHWENK ET AL. v. C. Z. KEHLER.

ERROR TO THE COURT OF COMMON PLEAS OF NORTHUMBER-
LAND COUNTY.

Argued May 21, 1888—Decided October 1, 1888.

1. If the plaintiff in an action to recover damages for injuries to a minor
son, knew that the employment in which the son was injured was dan-
gerous, but permitted him to remain in it without objection, he is charge-
able with contributory negligence and is not entitled to recover.

2. In such case, if the questions of negligence on the part of the defend-
ant in the use of insufficient and unsuitable appliances, and of contribu-
tory negligence on the part of the plaintiff in permitting his minor son
to continue in a dangerous employment, are both fairly raised by the
evidence, it is error to instruct in such way as might lead the jury to infer
that if the defendant's negligence were established that of the plaintiff
was unimportant.

Before GORDON, C. J., PAXSON, STERRETT, GREEN, CLARK
and WILLIAMS, JJ.: TRUNKEY, J., absent.

No. 130 January Term 1887, Sup. Ct.; court below, No. 250
September Term 1883, C. P.

On July 25, 1883, an action in case was begun by Charles Z.
Kehler against William Schwenk, George Robertson and Jacob
Geise, trading as Schwenk, Robertson & Co., to recover dam-
ages for injuries to his minor son alleged to have been the
result of negligence on the part of the defendants. The de-
fendants pleaded, not guilty.

At the trial on November 8, 1886, the case presented was in
outline as follows:

In September, 1882, the plaintiff was employed at the Black
Diamond colliery, operated by the defendants, and at his
request two of his boys were employed at the same mines, one
of whom, Daniel, was about 14 years of age. The plaintiff
gave directions to the defendants when Daniel was employed
that he was not to be put to work at more dangerous work than
slate picking. After a short time at the mines, Daniel was sent
out of the slate room to assist in hauling the cars conveying
the dirt out upon the dump. His father learned of this and

at once remonstrated with one of the defendant firm and re-quested that his boy be returned to the slate room. The part-ner said, "all right," and the boy was returned to his former employment.

On September 12th, Mr. Robertson came into the slate room and directed the breaker-boss to send a boy out to assist with the dump-car. The boss ordered young Kehler out. The boy objected, and was told to see Mr. Robertson. He did not see Mr. Robertson, however, but proceeded to the work directed, and was so engaged during part of that day, and part of the next day.

The car ran on an up grade to the dump, and was drawn by a mule hitched to it by a short chain hooked at the spreader and passing under the bottom of the car-box. To obtain a momentum which would carry the car to the breast of the dump, it was necessary that the mule should be driven rapidly with the load, and detached quickly at some distance from the end of the track. To detach the mule was the work assigned to young Kehler, and on account of his size, the only way he could do it, as was claimed, was to step in front of the moving car, detach the hook, when the mule would step to one side out of the way of the car. On the afternoon of September 13th, as he was in the act of detaching the mule in this manner he was caught by the car, thrown beneath it, and his right arm crushed so that it became necessary to amputate it near the shoulder.

There was testimony from which it was claimed that the car-track was not in proper condition, that the appliances in use for detaching the mule from the car were unsafe and essen-tially unlike those in use at some other collieries in the vicin-ity. The plaintiff admitted he knew of Daniel's employment with the dump-cars on the 12th, and was informed of it at dinner on the 13th, but as he had already remonstrated before then he hesitated to do so again, and moreover, did not meet with any of the defendants.

On the part of the defendants, testimony was introduced tending to show the plaintiff's knowledge of his son's dangerous employment with the dump-car, without objection; that the appliances were those ordinarily in use in collieries and were safe, and that it was unnecessary and negligent on the part of the boy to get in front of the car when detaching the mule.

Charge of Court below.

The facts disclosed by the evidence upon both sides suffi-
ciently appear in the portions quoted from the charge to the
jury, ROCKEFELLER, P. J.:

＊　　＊　　＊　　＊　　＊　　＊　　＊　　＊

Now, gentlemen of the jury, the evidence in the case shows
that sometime prior to September 12, 1882, Daniel Kehler was
employed by the three defendants, who were then in partner-
ship, operating the Black Diamond colliery near Mt. Carmel,
in this county; that he was a little over fourteen years of age
at the time.

The father seems to have been desirous of getting his sons
employment at the defendants' colliery for the reason that he
could lift their pay with his own, all at the same place. With
this end in view, he asked the defendants whether they had a
place or would give his son employment at some safe business
or work around the colliery. It was understood, as the plaint-
iff alleges, that his son Daniel was to work in the slate room
picking slate. That was an employment that was usually per-
formed by young boys and perhaps is not considered danger-
ous. Then, on this 12th day of September, the defendants,
doubtless for some reason, found it necessary to have a boy
go out on the dirt bank, the bank where the dirt and refuse
matter from the breaker were deposited by means of dump-cars
running over a railroad constructed for that purpose, the cars
being drawn by mules. The plaintiff's son Daniel was put
out there to perform this work on this dirt bank and he per-
formed it for several days. The exact number of days is not
proven, but the plaintiff himself said several days, from three
to five. The father of Daniel says that on one occasion he told
one of the firm, Mr. Robertson, I believe, that he didn't want
his son to work at that kind of work, also stating that he con-
sidered it dangerous. Mr. Robertson then took the boy off
and placed him back in the slate room. That was prior to the
12th of September. Then again, on the 12th of September,
the boy was put out on the dirt bank and the plaintiff saw him
there at work. He then had notice that the defendants were
having his son perform work on this dirt bank He had a
right, of course, to withdraw his son from such employment if
he saw proper so to do, and not permit him to perform that
kind of work. It seems that he did not on that day, or at any

other time, notify the defendants that he was unwilling his boy should continue there performing that kind of work. Now, we think, gentlemen of the jury, it is a question of fact to be determined by you from this circumstance, although the plaint-. iff had previously requested the defendants to take his boy off the dirt bank and put him at another place, and they did so— whether the plaintiff assented to, or permitted the boy to work on that bank. The fact that he saw him there performing that kind of work and did not give the defendants notice that he did not want him to continue there, is evidence from which the jury is permitted to find the fact of permission or assent on the part of the father. In order to determine that question, you will take into consideration all the evidence bearing upon that point on both sides. He alleges that it was his intention to give notice; that he endeavored to find Mr. Robertson that day or the day of the accident and notify him that he was unwilling his boy should continue on the dirt bank; that he was told that Mr. Robertson was not about the colliery, but that he had taken his gun and gone out for rabbits. On the other hand, you have the testimony of Mr. Robertson that he had not gone away and that he was about the colliery; that he was in the blacksmith shop doing blacksmithing; that the persons around there all knew that he was there on that occasion. Thus you see, the evidence on that branch of the case is contradictory. If Kehler, the plaintiff, knew that his son was at work on the dirt bank, that he had been put there by the defendants and employed in that way, and did not give them notice, if he had an opportunity of giving them notice, then this is evidence of his permission or assent. Then, if you should come to the conclusion that the dirt dump was not properly furnished with hooks or appliances that were reasonably safe and suitable for the performance of the work that the boy Kehler had to do, still, if the plaintiff knew his son was engaged there on the dirt banks, using the dirt dumps and still permitted or assented to his so working and using said dumps, he cannot recover in this case. It would be, we think, contributory negligence on his part if he assented or permitted his boy to be employed in the manner alleged, knowing, at the same time, that he was performing dangerous work. . . . . .

The evidence shows, if you believe the testimony on the part

of the plaintiff's witnesses, that on September 12, 1882, for some reason plaintiff's son was required to go out upon the dirt bank of defendants and drive, or assist in unloading the dirt. [Mr. Robertson, who, it seems, was the person who had charge of the defendants' business outside of its mines and about the colliery, went to the slate room where Edward Smith and the boys engaged in picking slate were, and told Mr. Smith that he should send a boy upon the dirt bank to assist in unloading the dirt. Mr. Smith then sent Daniel Kehler, the plaintiff's son. Mr. Robertson may not have specified the person that he wanted sent, and from the evidence, if you believe it, he did not specify what boy Smith should send. But in pursuance of Mr. Robertson's directions to send a boy out, Edward Smith did send out Daniel Kehler, and I do not see any other way than to hold that the act of sending Daniel Kehler out on the dirt bank, under such circumstances, was the act of Mr. Robertson himself. We are of the opinion that the case should be treated in that way, the same as if Mr. Robertson himself had ordered young Kehler to go out upon the dirt bank. So that it is not, in my opinion, a case of negligence on the part of a fellow-servant.] [7]

[There is one other matter to which I should, perhaps, allude, and that is, as to what took place between young Kehler and Edward Smith at that time, after Mr. Robertson had been to the slate room and made the request upon Smith to send a boy out. Smith then told Kehler, the plaintiff's son, that he should go out on the bank. Young Kehler hesitated, and remonstrated, perhaps, to some extent, you will recollect the evidence, stating that he did not want to go out. Mr. Smith, it seems, did not insist on his going out, but said that he should go and see Mr. Robertson. The boy, it seems, complained about the work being too hard, that it stiffened him up and the like. Mr. Robertson was about there, and the boy said himself in his evidence, that he supposed perhaps he might have gone up on the tip or somewhere about there, but instead of going to see Mr. Robertson, he went off and went on the dirt bank voluntarily. Now, gentlemen of the jury, taking into consideration all these facts and circumstances as detailed in evidence, as to the manner of young Kehler's employment and the circumstances under which he went out upon the dirt bank to work,

Charge of  Court below.

it seems to me, that the question to be determined is, after all,
whether the defendants did adopt and maintain suitable instru-
ments, in this case suitable cars, with proper or suitable appli-
ances or hooks and means with which to carry on the business
in which the plaintiff's son was employed, so that he could
perform his duty safely and without exposure to dangers which
did not come within the reasonable scope of his employment.] [8]
As I stated, if the machinery, that is, the cars, appliances
and hooks, were of an ordinary character and such as could
with reasonable care be used without danger, except such as
was reasonably incident to the business or work to be per-
formed, it was all that could be required. That is a question
of fact which I think the jury must determine from all the
evidence in the case.

There is a great deal of testimony given on both sides in
regard to the construction of the dump-cars, the chains, rings
and hooks, and the manner in which they were constructed
and used. The defendants contend that they were of an ordi-
nary character, and such as could with reasonable care be used
without danger, except such as was reasonably incident to the
business. You have the testimony of a number of witnesses
on both sides in regard to that matter. You will recollect that
on the dump-car on which young Kehler was employed there
was a chain the length of which was stated variously by the
witnesses. Some said three feet, some not so long and per-
haps some longer. The chain extended out beyond the box
some distance, and there was a ring in the end of it. Then
there was a spreader attached to this chain by means of a
hook, and a mule was attached to the spreader chains. It is
alleged that that was the ordinary way of constructing cars
and hooks for the purpose of taking dirt out from the collieries ;
that that was the general manner of construction at all col-
lieries in that neighborhood with some few exceptions ; that
there were some exceptional cases where there were side hooks
used, but that was where there was no grade upon the dirt
bank, and where locomotives were used to pull the cars out
from the breaker to the place where they were switched off
for a very short distance in order to be unloaded. They (the
defendants) contend that cases of that kind were the exception
and not the general rule ; that that was not the usual and

ordinary way of constructing dump-cars, their appliances, hooks, chains and so forth. They also say that the dump-cars in use on their dirt bank were not at all dangerous when used by persons who exercised ordinary care. Now, the plaintiff, on the other hand, contends that the manner in which the rings and hooks were used to attach the mule to these cars which were to be taken out to the dumping place was dangerous; that they were not of ordinary use, but were more than ordinarily dangerous, and could not be used without great danger.

Now, gentlemen of the jury, I leave all these facts to be determined by you from the evidence in the case. If you find in favor of the plaintiff, that is to say, if you find that the defendants did not adopt and use suitable instruments and appliances to their cars, suitable rings and hooks with which to carry on business of dumping the dirt from the colliery, so that plaintiff's son could perform those duties safely and without exposure to dangers which did not come within the reasonable scope of his employment, and that in consequence thereof an injury was sustained by the plaintiff's son, then you will determine what amount of damages the plaintiff is entitled to recover. But, as I have already stated, if this machinery, these hooks, rings and appliances to the dumps were of an ordinary character, and such as could with reasonable care be used without danger except such as was reasonably incident to the business, it was all that was required of the defendants and your verdict should be in their favor.

＊　　＊　　＊　　＊　　＊　　＊　　＊　　＊

Defendants' counsel request the court to charge the jury as follows:

1. The plaintiff having shown by his own testimony that he hired his son to work for the defendants, and that he saw his son on September 12, 1882, engaged on the dump-cars, similar to those on which he himself was working that day, and that he did not notify defendants, or either of them, or their foreman, of his unwillingness to have his son work in that position, he thereby assented to his employment in the business he was engaged in at the time of the injury, and cannot recover.

Answer: Under the evidence in the case, I leave it to the jury to determine whether the plaintiff assented to his son's

employment in the business he was engaged in at the time of the injury, and I refer you to what I have said in the general charge on this subject. If he did so assent he cannot recover.[1]

2. That the plaintiff having hired his son to the defendants to work at this colliery, and having testified that he knew, or believed that the work on the dump-cars was dangerous, and protested against his future service thereon, in pursuance of which protest the defendants removed his son to work in the breaker, yet having shown that he saw his son working again on the dump-cars on September 12, 1882, and permitted him to continue working, he was guilty of contributory negligence and cannot recover, and the verdict must be for the defendants.

Answer: If the plaintiff, knowing that the work on the dump-car was dangerous, permitted his son to continue working on the same, he was guilty of contributory negligence and I charge you as requested, but I refer you to the general charge.[2]

The jury returned a verdict in favor of the plaintiff for $500. Judgment being entered, the defendants took this writ and assigned as error, inter alia:

1, 2. The answers to defendants' 1st and 2d points. [1] [2]

7, 8. The parts of the charge embraced in [ ] [7] [8]

*Mr. S. P. Wolverton* (with him *Mr. W. B. Faust*), for the plaintiffs in error:

By a reference to the evidence it will be seen that the plaintiff himself testified that he saw the boy working on the dump on the day before the injury, and did not remove him therefrom nor did he object to his employment there to either of the defendants. It is submitted that under these facts, the court should have instructed that there could be no recovery. "It is generally, though not uniformly held, that an infant is personally chargeable with any negligence or other fault of his guardian whereby he is exposed to an injury. The true rule, as we think, is, that an infant is chargeable with any negligence of his guardian in putting or keeping him in a position of danger, or permitting him to be in such a position, but not for any negligence of his guardian in an individual capacity: . . . . So, if the parent or guardian of a child keep it in a position

known to such guardian to be dangerous, the child is chargeable with the knowledge:" Shear. & Redf. on Neg., § 48; and see McGary v. Loomis, 63 N. Y. 104 (20 Am. R. 510); Kay v. Penn. R. Co., 65 Pa. 269; Glassey v. Pass. Ry. Co., 57 Pa. 172; Mattey v. Whitier M. Co., 140 Mass. 337; O'Conner v. Railroad Co., 135 Mass. 352; Messinger v. Dennie, 137 Mass. 197, 335; Beach on Cont. Neg. 37, 151; Smith v. Pass. Ry. Co., 92 Pa. 450; Honor v. Abrighton, 93 Pa. 475; Cauley v. Railway Co., 95 Pa. 398.

*Mr. C. R. Savidge* (with him *Mr. Voris Auten*), for the defendant in error:

1. The evidence as to whether Daniel Kehler was on the dump, on the day of his injury, with the knowledge and consent of his father, the plaintiff, was conflicting, and it is submitted that the court below properly instructed the jury upon the subject. The question as to whether the defendant did his whole duty and acted as men exercising ordinary and reasonable care would have acted under the circumstances, was a question for the jury also, and to have taken it away from them would have been error.

2. Where evidence of contributory negligence is conflicting, or the facts on which a right to recover depends are controverted, a jury should pass upon the questions: Harrisburg v. Saylor, 87 Pa. 216. And where there is a reasonable doubt of the facts, or as to the inferences to be drawn from them, or where the measure of duty is ordinary and reasonable care, and the degree of care varies according to the circumstances, the question of contributory negligence is necessarily for the jury: Penn. R. Co. v. White, 88 Pa. 329; Penn. R. Co. v. Werner, 89 Pa. 59; Phil. Pass. Ry. Co. v. Henrice, 92 Pa. 431; Germantown Pass. Ry. Co. v. Walling, 97 Pa. 55.

OPINION, MR. JUSTICE WILLIAMS:

Daniel Kehler, a lad of about fourteen years, was injured at the colliery of the plaintiffs in error. The plaintiff is the father of Daniel, and brought this action to recover for loss of service of his minor son in consequence of the injury sustained. The negligence imputed to the defendants in the court below was the failure to provide suitable appliances for hitching and

unhitching the mules to and from the dumps in which the dirt and refuse were taken to the dirt piles. The defendants below denied that the appliances were unsuitable, asserted that they were in the usual form, and that the plaintiff having full knowledge of their character and of the employment of his son upon the dumps, and making no objection thereto, was guilty of contributory negligence and could not recover even if the jury should find the appliances to have been unsuitable.

This subject was brought to the attention of the court by the first and second points of the defendant, and the court correctly instructed the jury in answer to the second point that "if the plaintiff knowing that the work on the dump-car was dangerous, permitted his son to continue working on the same, he was guilty of contributory negligence and I charge you as requested, but I refer you to the general charge."

In the general charge, after a review of the questions raised, the learned judge said: "Now, gentlemen of the jury, taking in consideration all these facts and circumstances as detailed in evidence as to the manner of young Kehler's employment and the circumstances under which he went out upon the dirt bank to work, it seems to me that the question to be determined after all is, whether the defendants did adopt and maintain suitable instruments in this case, suitable cars with proper or suitable hooks or appliances," etc. Again, in the concluding part of the charge the learned judge instructs the jury as follows: "Now, gentlemen of the jury, I leave all these facts to be determined by you from the evidence in the case. If you find in favor of the plaintiff, that is to say, if you find that the defendants did not adopt and use suitable instruments and appliances to their cars . . . . and that in consequence thereof, an injury was sustained by the plaintiff's son, then you will determine what amount of damages the plaintiff is entitled to recover. But as I have already stated, if these hooks, rings, and appliances to the dumps were of an ordinary character . . . . your verdict should be in their favor."

We are of opinion that the complaint made by the plaintiffs in error that the answers to the first and second points of the defendants below, submitting to the jury the question of the plaintiff's contributory negligence, were practically withdrawn or nullified by the general charge to which they were referred,

is well founded. It was important that the jury should have their attention drawn distinctly to the sufficiency and suitableness of the method of unhitching the mules from the dump-cars in use at this colliery, for the question of the negligence of the employer depended upon whether he had made reasonable provisions for the safety of his employees. But it was equally important that the attention of the jury should be drawn to the other question, whether if the employers were guilty of negligence the plaintiff was not chargeable with contributory negligence in permitting his son to continue in a dangerous employment, he having, as appeared from his own testimony, knowledge of the manner in which the dumps were handled, and of the fact that his son was employed upon them.

While the answers to the points raising this question are correct, their reference to the general charge, and the great prominence given in the general charge to the other question, that of the negligence of the employers, are calculated to obscure or minimise the question of the contributory negligence of the plaintiff. In effect, it is as though the court had said to the jury, "The controlling question in this case is whether the defendants provided suitable appliances for their cars, and if you find they did not, you should determine what amount of damages the plaintiff has sustained." The learned judge did say this substantially when he said, "It seems to me that the question to be determined after all is whether the defendants did adopt and maintain suitable instruments," etc. The jury would naturally understand from the language of the general charge that the opinion of the judge was, that the other questions raised were relatively of little importance and ought not to stand in the plaintiff's way if, upon the question of the suitableness of the appliances used upon the dump-cars, they should find for the plaintiff. This was not an adequate presentation of the defence, and for this reason the case must go back for another trial.

Judgment reversed, and venire de novo awarded.